# IN THE COURT OF APPEALS OF IOWA

No. 14-0154
Filed May 6, 2015

**KENNETH M. BRONNER,**
        Plaintiff-Appellee,

**vs.**

**SUSAN RANDALL, GLEN BENSON, KRISTI BLACK,**
**and ELSIE PINT,**
        Defendants-Appellants,

**and**

**KELLY BRODERMANN and THERESA BRONNER,**
        Defendants.
_____

Appeal from the Iowa District Court for Howard County, John J. Bauercamper, Judge.

Certain beneficiaries appeal a jury's verdict which set aside the beneficiary designation of an investment account based on mental capacity and undue influence, found tortious interference, and assessed punitive damages and attorney fees. **AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.**

Judith O'Donohoe of Elwood, O'Donohoe, Braun, White, L.L.P., Charles City, for appellants.

Brian R. McPhail of Gross & McPhail, Osage, for appellee.

Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**VOGEL, P.J.**

This case involves a dispute over the number and identity of the beneficiaries of the late Edith Benson's investment account with Ameriprise Financial. Kenneth Bronner filed suit asserting Susan Randall, Glen Benson, and Elsie Pint intentionally interfered with Edith's designation of him as a one-sixth beneficiary of the account. He also sought to have the beneficiary designation executed by Edith in 2010 set aside due to undue influence and a lack of mental capacity. The jury agreed with Kenneth, awarding him, and assessing against Susan, Glen and Elsie, actual damages, attorney fees, and punitive damages. Susan, Glen, and Elsie appeal asserting the court should have directed the verdict in their favor or ordered a new trial. They also assert the judgment should not have been entered on the jury's verdict as it resulted in duplicative damages.

Having considered the claims made on appeal, we conclude sufficient evidence was submitted to conclude Edith lacked mental capacity in July of 2010 when she executed the beneficiary change and there was evidence the change was procured through undue influence. However, there is a complete lack of evidence to support an award of attorney fees in favor of Kenneth and the jury's verdict in this case resulted in duplicative damages. We therefore vacate the court's judgment entry, and remand the case for entry of judgment on count one, setting aside the 2010 beneficiary designation and reinstating the prior beneficiary designation executed by Edith in 2005. The award of attorney fees on count two is stricken for lack of proof, and the award of "expectancy" damages

is stricken because it duplicates the judgment from count one. However, the award of punitive damages on count two is affirmed.

## I. Background Facts and Proceedings.

Both Edith and her husband, Edward (Ed) Benson, came from large families, though the two never had any children. Edward died in 1992 leaving all of his property to Edith. In February 2005, Edith executed a beneficiary designation form with respect to her Ameriprise Financial account, leaving a one-sixth share to these named beneficiaries: Kenneth and Glen, two of Edith's nephews; Susan and Kristi, two of Edith's nieces; Kenneth R. (Rusty), Kenneth's son and a great-nephew to Edith; and Kelly, Kenneth's daughter and a great-niece to Edith. A notation in the Ameriprise Financial file indicated Edith made this change because "she decided she wanted to have the six relatives that had helped her and Ed the most."

Fast forward to the last year of Edith's life when her physical health and mental acuity appeared to deteriorate, resulting in the focal issues at trial. In late June 2010, Edith was admitted to the hospital with congestive heart failure and coronary artery disease. She was discharged from the hospital on July 2, and Edith's sister, Elsie,[1] came to Iowa from Arizona and stayed with Edith in Edith's home for almost two weeks. The day Edith was released from the hospital, Elsie called another of Edith's nephews, attorney Joseph (Joe) Haskovec, at Edith's request, declaring to him that Edith wanted to make some changes to her will. Elsie stated Edith wanted to provide for Theresa (Terri), Rusty's wife and

---

[1] Elsie is the mother of Susan, one of the beneficiaries under the Ameriprise Financial account and also an appellant in this appeal.

Kenneth's daughter-in-law, who had helped Edith over the years and whom she both liked and trusted.

Joe came to Edith's house on July 6 and spoke with Edith and Elsie for about two hours. Joe did not notice any signs that Edith was having cognitive difficulty or had any difficulty in carrying on a conversation. Edith told Joe she wanted to provide something for Terri for all that she had done for Edith and that Kenneth was to be removed from the will because he had borrowed money from her and had not paid it back, and that he had made a disparaging remark about Ed's family. They also briefly spoke about the Ameriprise Financial investment account, but Joe directed Edith to her financial planner as Joe could not make any changes to the beneficiaries designated. Joe came back to Edith's house two days later, on July 8, with the updated will and medical and financial powers of attorney per their initial discussions and had Edith execute those documents.[2]

In the meantime, Elsie also contacted the Ameriprise Financial agent on behalf of Edith. The Ameriprise Financial records indicate that on July 7, 2010, Nikki Felper, who handles client services including telephone reception, received a call from Elsie. Home office records contained this notation: "Nikki spoke with Edith's sister from AZ. She called in and said that Edith was upset about the beneficiaries and wanted to update them. They came in to pick up the beneficiary form and mailed it back into us. This was sent in to the H.O. today." Elsie testified she did call the agent for Edith, but it was Edith, not Elsie, who spoke with Nikki about changing the beneficiary form. Elsie asserted the agent

---

[2] The 2010 will was not properly executed so it was found to be invalid, and Edith's 2005 will was admitted to probate instead.

then mailed the form to Edith, Edith executed the beneficiary change, and she returned the form to the Ameriprise office the same day it arrived in the mail. Elsie denied signing the form for Edith or inserting Edith's middle initial above Edith's signature, although at this point, Edith was nearly blind. As a result of the changes made on July 7, Kenneth and Rusty were removed as beneficiaries on the account, and Terri was added. This also left the newly designated beneficiaries as receiving one-fifth, rather than one-sixth, share of the account according to the prior designation.

Elsie left to return to Arizona on July 10, but before she left, Elsie gave her daughter, Susan, the power of attorney form Edith had executed naming Susan Edith's attorney-in-fact. Terri resumed regular daily care of Edith, as she had done prior to Edith's hospitalization in late June.[3] Terri would check on Edith once and sometimes twice a day. In July, Terri described Edith as "not herself." She was sleeping a lot and not talking. Edith went to the emergency room in late July but was sent home. Other family members, Kristi Black and her husband Gary, came and stayed with Edith for a weekend starting July 30, and they reported to Terri when they left that Edith could not live alone any more. Kristi reported Edith was not "making sense," was sleeping all the time, not getting dressed, and not eating. Later that day, Terri and Rusty, while at Edith's home, confirmed these observations.

---

[3] Terri testified that, beginning in 2007, she regularly cared for Edith after Edith lost the vision in her eyes and was no longer able to drive. Terry would get her groceries, take care of filling her weekly medication planner, pick up prescriptions, take her to doctor's appointments, perform light housekeeping, run errands, help write out Edith's bills, and assisted with Edith's Ameriprise account. Terri estimated she was at Edith's house five to six times a week, and sometimes twice a day.

Edith was admitted to the hospital the day after Kristi and Gary left. Terri told Elsie that Edith was back in the hospital, and then Terri received a call from Susan informing her that Edith had appointed Susan as her attorney-in-fact. Susan also informed Terri at this time that Edith had also changed her will when Elsie was in Iowa in July. Susan and Glen then changed the locks on Edith's house while Edith was in the hospital. Susan also attempted to have Edith placed in a nursing home out of town. It was later clarified that Terri was designated as Edith's agent under a durable power of attorney for health care decisions and Susan was appointed attorney-in-fact with regard to all other matters, including financial decisions. Edith was admitted to a local nursing home on August 5, but she was readmitted to the hospital two days later. Edith was in the hospital for another two weeks and eventually passed away on August 26, 2010.

After it was discovered the Ameriprise beneficiaries had been changed, in addition to the execution of the new 2010 will, Kenneth brought this action against all of the 2010 beneficiaries asserting Edith lacked the mental capacity in July 2010 to change the beneficiaries or someone exerted undue influence on her to make the change. Kenneth asked "that the Court set aside the purported change of beneficiary form which occurred on or about July 8, 2010." He later amended the petition to add Elsie as a defendant and asserted a claim of tortious interference with a gift or inheritance against Susan, Glen, and Elsie. He claimed they caused him to lose his expected inheritance by fraud, duress, undue influence, and defamation. He sought damages "in an amount which will fully and fairly compensate him for his loss of expectancy, for attorney fees and

litigation costs, for exemplary damages against Defendants, for costs of this action and for interest as provided by law."

The case proceeded to a jury trial in November 2013. After hearing testimony from twenty-four witnesses over eight days, the jury returned a verdict finding on count one that Kenneth proved Edith did not have the mental ability to make changes to her beneficiary designation on July 7, 2010, and that Edith was unduly influenced to make those changes. It also found on count two that Susan, Glen, and Elsie improperly interfered with Kenneth's reasonable expectation of receiving a share of the Ameriprise account, and that Kenneth was damaged as a result. The jury awarded Kenneth $22,706.65 in "loss of expectancy from Ameriprise account," $23,497.31 in attorney fees, but nothing for emotional distress. The jury also concluded that Kenneth proved Susan's, Elsie's, and Glen's conduct constituted a willful and wanton disregard of Kenneth's rights and awarded Kenneth punitive damages in the amount of $7500 from Susan, $12,500 from Elsie, and $5000 from Glen. Susan's and Elsie's counterclaims for malicious prosecution were rejected by the jury.

Susan, Glen, and Elsie filed a motion for a new trial asserting (1) there was insufficient evidence on a number of issues; (2) there was an irregularity in the proceedings or misconduct of the jury because the jury arrived a very specific figure for attorney fees though there was no evidence of the amount of attorney fees incurred by Kenneth; (3) there was an accident or surprise occurring during closing argument that was prejudicial to them; (4) the damages, specifically the punitive damages and attorney fees, were excessive and influenced by passion or prejudice; (5) lay witnesses were allowed to offer improper opinion testimony

regarding Edith's competence and susceptibility to undue influence; (6) the jury instructions were improper or incomplete; (7) Kenneth lacked all credibility; and (8) the verdict as a whole did not affect justice and the defendants did not receive a fair and impartial trial.

The district court overruled the motion for a new trial on all grounds and also overruled Susan, Glen, and Elsie's motion for a directed verdict or judgment notwithstanding the verdict. The court's judgment entry stated judgment was entered on the verdict in favor of Kenneth and against Susan, Glen, and Elsie in actual damages in the amount of $46,203.96. The court also entered judgment individually against Susan, Elsie, and Glen in the respective amounts of punitive damages awarded by the jury.

The defendants filed a notice of appeal and also filed a "request to modify judgment to reflect verdict" seeking for the damages to be assessed against all five of the 2010 beneficiaries of the Ameriprise account rather than just against Susan, Glen, and Elsie (who was never a beneficiary of the Ameriprise account). The supreme court granted a limited remand for the district court to address this request, as the notice of appeal had already been filed depriving the district court of jurisdiction. The district court denied the motion concluding both counsel were given an opportunity when the jury returned the verdict to voice any concerns related to the verdict, including any inconsistencies, and no concerns were indicated. The court concluded the verdict was internally consistent and not contrary to the jury instructions. As to the actual damages, the court concluded Susan, Glen, and Elsie were joint tortfeasors and judgment should not be apportioned between them. The court found no basis for entering judgment

against the other 2010 beneficiaries—Kelly, Kristi, and Terri—because Kenneth did not allege any liability on their part, the instructions did not include claims against them, and there was no cross-claim for damages, contribution, or indemnity against them.

Susan, Glen, and Elsie appeal the judgment entered.

## II. Sufficiency of the Evidence.

The parties agree that we review motions for a directed verdict or motions for judgment notwithstanding the verdict based on insufficient evidence for correction of errors at law. *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). Susan, Glen, and Elsie challenge the sufficiency of the evidence on a number of grounds. Under such a challenge, we must decide "whether there was sufficient evidence to justify submitting the case to the jury when viewing the evidence in the light most favorable to the nonmoving party." *Id.* The plaintiff's claims must be supported by substantial evidence, which is evidence a reasonable mind would find adequate to support a finding. *Id.* "'Simply put, we ask, was there sufficient evidence to generate a jury question?'" *Id.* (citations omitted). The first challenge is to the evidence to support Kenneth's claim that the beneficiary designation should be set aside because Edith lacked the mental capacity or was unduly influenced by Susan, Glen, and/or Elsie.

**A. Setting Aside Beneficiary Designation.** Susan, Glen, and Elsie assert the only evidence of Edith's mental capacity at the time she changed the beneficiary designation in July 2010, came from her nephew, attorney Joe Haskovec, who met with her on July 6 and July 8 to discuss changing her will.

They assert Joe's testimony clearly established that Edith knew what her assets were, specifically knew about the Ameriprise Financial account, and knew what changes she wanted to make: remove Rusty and Kenneth, and add Terri. They contend this change made sense in light of the assistance Terri offered to Edith over the years, the fact that Rusty was getting certificates of deposits through the will, and that Edith felt Kenneth owed her money and had made disparaging remarks about her husband's family. They also assert Edith's medical records do not indicate a lack of mental functioning through her discharge from the hospital on July 2, 2010.

The jury was instructed:[4]

A person has the mental capacity to change a beneficiary designation if she:
    1. Knows a beneficiary change is being made.
    2. Knows the kind and extent of her property.
    3. Is able to identify and remember those persons she would naturally give her property to.
    4. Knows how she wants the beneficiary designation to distribute her property.
    A beneficiary designation is valid if the person making the designation meets the above tests, even if her mental or physical powers are impaired. However, you may consider physical weakness or infirmity, the rational nature of the distribution, along with any other evidence in deciding if a person has mental ability to make a beneficiary designation.

At trial Terri testified Edith's health was declining in the spring of 2010. Edith was not remembering where she put things and becoming very agitated. She thought people were sneaking into her house and taking things. Terri

---

[4] On appeal no one challenges the law in the instructions, just that the evidence did not support the jury's findings. So we will examine the sufficiency claims made in light of the instructions the court gave to the jury, which is now the law of the case. *See Hoskinson v. City of Iowa City*, 621 N.W.2d 425, 430 (Iowa 2001) (noting that the jury instructions become the law of the case where neither party objected to the instructions).

reminded her that the house was locked every night. Terri would later find items in other places in the house that Edith thought had been taken. Edith was sleeping a lot more and not eating as much.

Terri thought Edith was easily influenced by others. Terri testified that during Edith's hospital stay in June, Edith made many statements that were simply untrue. For example, Edith said that Terri had taken her to see the doctor and left her there; that she had never seen the doctor but had only seen his nurse; that the nurse was the doctor's wife, as well as saying that she had eaten breakfast in a park with "the kids." These and other statements confirmed for Terri that Edith was confused. Even after Edith came home from the hospital, she made similar, disjointed, or fabricated comments. Although Edith was discharged from the hospital in early July, Terri did not agree with Edith being released to her home, as Terri thought Edith needed transition to a nursing home, to help with medication management. Edith was on a number of new medications, and after Terri brought her home, Edith was "very agitated, very, very upset" and expressed concern about keeping up the medication regimen.

On either July 6 or 7, Terri stopped in to see Edith, and Elsie was present. Edith was upset because she could not find her wedding rings. Terri testified, "Elsie was standing in back of her, waving her hands like this, and just shaking her head, as if Edith was just goofy." The next day, Terri said Edith

> would sit at the table and just kind of stare off into space. She would not talk to me like she normally did. She would be sleeping a lot more. She was not eating like she was supposed to. We had Meals on Wheels coming to the house. She wouldn't—she would leave them sit on the counter. I said, "Aren't you going to eat?" She said, "No, put it in the fridge. I'll eat it for supper." I would

come the next day and she would not have touched her meals. So things were just not right.

Even as early as Thanksgiving in 2009, Kenneth described Edith as having a hard time comprehending and could not hold a conversation. Edith would also fall asleep after ten to fifteen minutes. She also could not recognize a lot of Kenneth's grandchildren. A few days after Thanksgiving and into 2010, Edith mistook Kenneth for his father and asked him questions that pertained to Kenneth's father and farm tasks from long ago. In May of 2010, Kenneth described that he was at Edith's house, and she was yelling but was not making sense. Kenneth described visiting Edith in the hospital in late June 2010, when Edith did not realize what was going on, and Kenneth was unable to have a conversation with her.

Kenneth disputed much of the medical records from the spring and early summer of 2010 that described Edith as "very alert" and a "very good historian." There was also a medical note from August 2, 2010, that indicated Edith had been "mentally very sharp" three weeks earlier. Other medical records indicated otherwise, that on June 24, Edith had poor vision, trouble hearing, memory problem, mobility problems, depression, nausea, numbness, and weakness. It was indicated on June 26 that Edith would not be able to return to independent living. Also, on August 5, Edith's doctor noted confusion and dementia.

Edith's neighbors, Wendy and David Melver, lived next to Edith for seventeen years. Wendy and David assisted Edith in many daily chores including running errands, lawn maintenance, and snow removal. Wendy would see Edith at least four times a week or would talk to her on the phone. David

would see Edith every day. Six to eight months prior to Edith passing away, Wendy noticed Edith had changed mentally as she was more confused. Wendy noted during her June hospitalization, Edith did not know why she was there even after the nurses and doctor told her. Wendy did not think Edith was in her right mind for at least six months prior to her death. David noticed Edith was slowing down and would not say much in response to his questions in March and April 2010. While he could not remember the precise date, David also remembered looking in on Edith and she was slumped over in her chair. He immediately asked Wendy to contact Terri because Edith was not acting right.

While there was certainly conflicting evidence as to Edith's mental state, there was sufficient evidence to generate a jury question as to whether Edith had the mental capacity to execute the change to the beneficiary designation on July 7, 2010. There was evidence Edith was confused as to who certain family members were, confused as to where she was or whom she was with, and she could not hold a conversation. She had been released from the hospital only five days before the beneficiary designation was changed and was acting "dramatically different" at that time according to Terri and those who knew her best in the final years of her life. Viewing the evidence in the light most favorable to the jury's verdict, as we must, we conclude the court did not error in submitting the issue of Edith's mental capacity to the jury. *See Van Sickle Constr.*, 783 N.W.2d at 687.

With respect to the undue influence claim, Susan, Glen, and Elsie claim the change made by Edith was consistent with statements she made to a number of individuals including Terri and Edith's financial planner. They also claim that

there was never a showing that Susan, Glen, or Elsie made any comments about Edith's will or the Ameriprise account, or any indication that any of them had any inclination to interfere with Edith's plans. They also contend there was no evidence Edith was susceptible to other people's suggestions. They note Elsie is the only one to have been shown to have any knowledge or opportunity to influence Edith, but there was a lack of evidence that she ever said anything to Edith about how she should handle her affairs.

The jury instruction addressing the undue influence claim stated that Kenneth had to prove:

> 1. At the time the beneficiary designation was made, Edith Benson was susceptible to undue influence.
> 2. One or more persons had the opportunity to exercise such influence and carry out the wrongful purpose.
> 3. One or more of the defendants was inclined to influence Edith Benson unduly for the purpose of getting an improper favor.
> 4. The result was clearly brought about by undue influence.

The jury was advised that in considering whether there was undue influence, they could consider:

> a. Dominance over Edith Benson,
> b. Whether the condition of Edith Benson's mind was subject to such dominance,
> c. Whether the results of the contracts are unnatural, unjust, or unreasonable,
> d. The activity of the defendants and whether they had the opportunity and frame of mind to exercise undue influence. Activities may include suggestion, request and persuasion short of controlling the will of Edith Benson, but they do not alone constitute undue influence. Consider such activities along with any other evidence of undue influence,
> e. The intelligence or lack of intelligence of Edith Benson,
> f. Whether Edith Benson was physically or mentally weak,
> g. Whether the defendants were the controlling parties in a confidential relationship with Edith Benson.
> h. Any other facts or circumstances shown by the evidence which may have any bearing on the question.

At trial Terri testified Edith's health was declining in the spring of 2010. Edith had completely lost her vision and relied on others for everything. Terri testified she thought Edith was easily influenced by others. Terri also did not agree with Edith being released from the hospital in early July. Elsie came from Arizona and cared for Edith after she was discharged from the hospital on July 2. Terri, who had been caring for Edith daily up until that point, did not see Edith during this time except for a brief interaction when Edith was upset about some rings that were allegedly missing from Edith's safe.

Those who knew Edith, including Terri, Kenneth, and Edith's neighbor, Wendy Melver, indicated that Edith would have never asked Joe Haskovec for help with her estate planning due to her dislike of Joe. Yet Elsie contacted Joe the same day Edith was released from the hospital asking for him to meet with Edith so she could change her will and beneficiary designations. The contact records from Ameriprise Financial indicate Elsie was the one to call to say Edith wanted to make a change to her beneficiaries. Elsie was the only one present when Edith purportedly signed the beneficiary change form. And Elsie accompanied Edith when they returned the form to Ameriprise the same day the change form was received in the mail—July 7, 2010.

Terri, the person Edith relied on and trusted the most in the final years of her life, had no knowledge of any of the changes being made until Edith was admitted to the hospital in August. It was then that Susan contacted Terri to inform Terri that Susan held the power of attorney and changes had been made to Edith's will. At that time Susan also attempted to have Edith moved from her local community to another nursing home facility close to Susan.

All these facts, if believed by the jury, would support a conclusion that Edith was in a weakened state, both physical and mentally; Elsie and Susan had the opportunity to exert undue influence; during this time Edith acted in a way that was not in keeping with her normal habits and character; and the changes made to the beneficiary designation benefited Susan and Glen, as the number of beneficiaries of the account was reduced from six to five.[5] We conclude the court was correct to submit this issue to the jury.

**B. Tortious Interference.** Next, Susan, Glen, and Elsie assert there was insufficient evidence to support Kenneth's claim that they tortiously interfered with his expectation of a portion of the Ameriprise account. They assert there was no evidence Susan or Glen even knew of the Ameriprise account or that Kenneth was a beneficiary. While Elsie was aware of the investment due to Edith discussing the asset during her meeting with Joe on July 6, they contend there was no evidence to support the conclusion Elsie exerted undue influence over Edith to make the change. They also point to the lack of evidence of any animosity between Kenneth and Susan, Glen, and Elsie such as would motivate them to interfere with Kenneth's expected inheritance.

---

[5] In addition to changing the beneficiary designation, Edith, during the time Elsie came to stay with her, appointed Susan, Elsie's daughter, as her power of attorney for financial matters and Edith nominated Susan to be the executor of her estate in her 2010 will. Glen was nominated to be the executor if Susan could not serve. The 2010 will also divided Edith's property in equal shares to the five individuals who were to receive a share of the Ameriprise Financial account. Under the prior 2005 will, Kenneth was nominated to be the executor, and Rusty was nominated to serve as executor if Kenneth could not serve. The 2005 will also divided Edith's property amongst the same six individuals that were selected to be beneficiaries of the Ameriprise Financial account under the 2005 beneficiary designation. Thus, the effect of the changes Edith made to her will, powers of attorney, and beneficiary designations following her release from the hospital in early July 2010 was to completely remove Kenneth from her estate planning. It was Edith's 2005 will that was admitted to probate after it was discovered the 2010 will was invalid due to a lack of a contemporaneous witness's signature.

The jury was instructed that in order to prove his claim, Kenneth needed to prove:

1. The plaintiff had a prospective expectation that he would receive a portion of Edith Benson's Ameriprise account upon her death.
2. The defendant or defendants knew of the expectation.
3. The defendant or defendants intentionally and improperly interfered with the expectation by undue influence.
4. The interference caused Edith Benson not to keep Kenneth M. Bronner listed on her beneficiary designation; and
5. The nature and amount of damage.

Susan, Glen, and Elsie do not challenge that there was evidence that Kenneth had a prospective expectation of receiving at least a portion of Edith's Ameriprise account, and as stated above, there was sufficient evidence of undue influence. The evidence also sustains the conclusion that the interference led Edith to remove Kenneth from the designation and there was clearly damage: one-sixth of the total value of the Ameriprise account. While there is a lack of evidence as to whether Susan, Elsie, and/or Glen knew of Kenneth's expectation to receive a share of the Ameriprise account, it was reasonable for the jury to conclude based on the evidence presented that Susan, Glen, and Elsie would know Kenneth expected to receive something from Edith upon her passing considering how close Kenneth was to Edith and Ed. The action taken by Edith after being released from the hospital was to remove Kenneth from all of her estate plans including removing him as executor of her estate, removing him as a beneficiary under her will, and removing his name as a one-sixth beneficiary of the Ameriprise account. We conclude there was sufficient evidence in the record for the jury to conclude Susan, Elsie, and Glen knew of Kenneth's expectation to

some portion of Edith's estate and interfered with this expectation to influence Edith to completely remove Kenneth from her estate plans.

**C.  Attorney Fees and Punitive Damages.**  The final challenge to the sufficiency of the evidence is made against the jury's award of attorney fees and punitive damages.  Susan, Glen, and Elsie assert Kenneth failed to offer any evidence whatsoever as to the amount of attorney fees incurred in this matter.  They claim the topic of attorney fees was never discussed with the jury at all.  However, somehow the jury awarded a very specific amount of attorney fees: $23,497.31.  Because there was no evidence of the amount of attorney fees incurred, they assert the issue should never have been submitted to the jury in the first place.[6]  They also assert there was no evidence that any of them acted with willful or wanton disregard for the rights of another so as to justify an award of punitive damages in this case.

Kenneth asserts there can be no speculation or uncertainty that attorney fees were incurred in the prosecution of the action.  The uncertainty, if any, he claims lies only in the amount.  He asserts that when there is uncertainty only as to the amount of damages, recovery is still allowed if there is proof of a reasonable basis from which the amount can be inferred or approximated.  In

---

[6] Neither party appealed the issue of whether attorney fees were a proper element of damages in a case of tortious interference with a bequest.  We thus do not pass on that issue.  However, we noted remedies for an intentional interference with a bequest include damages for pecuniary loss, consequential loss, and emotional distress.  *Huffey v. Lea*, 491 N.W.2d 518, 520 (Iowa 1992).  This can also include attorney fees.  *Id.* at 521.  In the *Huffey* case, the supreme court stated, "We are strongly committed to the rule that attorney fees are proper consequential damages when a person, through the tort of another, was required to act in protection of his or her interest by bringing or defending an action against a third party."  *Id.* at 522.  It thus appears that the attorney fees that are recoverable in a case such as this are the fees incurred trying to correct or remedy the tortious action of the defendant, not the fees incurred in suing the defendant for tortious interference.  *See id.*

support of his assertion, he cites to *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998). However, the *Olson* case deals with damages in general and not specifically with proof to support the recovery of attorney fees.

As to punitive damages, Kenneth asserts the facts clearly show Susan, Elsie, and Glen tried to cut him out of Edith's estate plans. They cut Kenneth out of the Ameriprise account and tried, unsuccessfully, to cut Kenneth out of the will and his role as the executor. They locked Kenneth and his family out of the house after Edith went to the nursing home. They refused to give a key to Kenneth's family. They attempted to take charge of Edith's care and have her transferred out of the community. They took control of Edith's finances through her power of attorney and refused to pay bills from the nursing home. All these facts Kenneth asserts combine to generate a jury question on the issue of punitive damages. We agree.

However, we cannot conclude there was sufficient evidence of Kenneth's attorney fees to justify submitting that issue to the jury. As asserted by Susan, Glen, and Elsie, there was absolutely no evidence offered to the jury regarding the attorney fees incurred. While Kenneth and district court note the jury could have been aware of the general proposition that some attorneys take cases on contingency, there was no evidence presented to this jury that Kenneth's attorney took this case on contingency or what the terms of such an agreement were. Nor was the amount of attorney fees awarded by the jury at all correlated to a typical one-third contingency fee arrangement. Kenneth and the district court also point to the fact that the jury was aware the case lasted eight days with twenty-four witnesses. While this is true, there is nothing to support a conclusion

that an eight-day jury trial with twenty-four witnesses should equate to an attorney fee award of $23,497.31 where there was no evidence of the attorney's hourly rate or the amount of time spent preparing for the trial. Because there was absolutely no evidentiary support for the attorney fee claim, this element of damages in the tortious interference claim should not have been submitted to the jury and that award is stricken from the judgment entry.[7]

## III. New Trial.

In the posttrial motion filed by Susan, Glen, and Elsie, a number of grounds were asserted in support of their contention they were entitled to a new trial. In addition to asserting the verdict was not sustained by sufficient evidence as analyzed above, they also assert the district court erred in failing to instruct the jury on the definition of preponderance of the evidence, the jury committed misconduct or there was an irregularity in the proceeding due to the jury's award of a specific amount of attorney fees where there was no evidence to support the amount awarded, the verdict was excessive, and the verdict failed to do justice. *See* Iowa R. Civ. P. 1.1004(1), (2), (4), (8), (9).

Our review of the district court's ruling a motion for a new trial depends on the grounds asserted in the motion. *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 49 (Iowa 2008). "If the motion and ruling are based on a discretionary ground, the trial court's decision is reviewed for an abuse of discretion." *Id.* The

---

[7] Susan, Glen, and Elsie also assert the district court should have granted their motion for a new trial because the very specific amount of attorney fees awarded by the jury— $23,497.31—indicates the jury considered evidence outside the record. As we have already concluded, due to a lack of evidence the jury should not have been asked to award attorney fees on the intentional interference claim. That element of damages has already been stricken from the judgment entry, and we therefore need not address this claim further.

claim that the verdict is excessive is reviewed for abuse of discretion. *Id.* We also review for an abuse of discretion a claim that the verdict was the result of misconduct. *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012) ("If the motion [for a new trial] is based on a discretionary ground such as misconduct it is reviewed for an abuse of discretion." (alternation in original)). However, the claim that the court committed legal error by failing to properly instruct the jury is reviewed for correction of errors at law. *Id.*

**A. Jury Instruction.** First, Susan, Glen, and Elsie claim the court erred in not instructing the jury on the burden of proof and failed to mention the standard anywhere in the instructions regarding Kenneth's claim to set aside the beneficiary designation. In addition, while the instruction on the intentional interference claim mentioned the preponderance-of-the-evidence standard, no instruction ever defined the standard for the jury.[8]

Kenneth contends that this claim of error was not preserved because an instruction defining preponderance of the evidence was not requested by

---

[8] Susan, Glen, and Elsie claim the proper burden of proof for both the mental capacity claim and the undue influence claim is a preponderance of the evidence. Kenneth does not contend otherwise. We note a claim of undue influence in a will contest must be proved by a preponderance of the evidence, but a claim of undue influence related to an inter vivos transfer carries a higher burden of proving the case by "clear, satisfactory, and convincing evidence." *In re Estate of Todd*, 585 N.W.2d 273, 277 (Iowa 1998). The same burdens apply when dealing with mental capacity to make an inter vivos disposition of property versus a disposition of property by will. *See Daughton v. Parson*, 423 N.W.2d 894, 896 (Iowa Ct. App. 1988) ("The party alleging lack of mental capacity sufficient to execute a deed has the burden of proving by clear, convincing, and satisfactory evidence that the grantor did not possess 'sufficient consciousness or mentality . . . to understand the import of her acts' when the deed was executed. A higher degree of mental competence is required for the transaction of ordinary business and the making of contracts than is necessary for testamentary disposition of property." (internal citations omitted)). We need not determine what burden was applicable here to prove Edith lacked the mental capacity or was unduly influence to change the beneficiary designation on her Ameriprise Financial account as both parties agree the applicable burden of proof is a preponderance of the evidence.

opposing counsel—counsel only requested a definitional instruction for clear and convincing evidence. In addition, he claims any error in not identifying the burden of proof for count one—setting aside the beneficiary designation—was not prejudicial because judgment was not entered on this count, but only entered on count two—intentional interference with a bequest. Because there was no prejudice, Kenneth claims the lack of an instruction on the burden of proof does not warrant granting a new trial.

At trial, defense counsel's request for a burden-of-proof instruction consisted of the following request:

> Also, I don't see anything, unless I'm looking too quickly, that indicates what the burden of proof is for other items not including punitive damages and confidential relationships which are governed by clear and convincing standard. And I think it would be appropriate to have some kind of burden of proof instruction, especially in light of the issues related to jury instructions, and also we don't really have a definition either of what clear and convincing evidence consists of.

She went on to address the issue again, stating:

> Your Honor, I'm going to amend my objection with respect to the burden of proof because I do believe at least with respect to the interference cause of action, it's indicated that it's by preponderance of the evidence. Let's see if the will contest is the same. I guess I didn't see in the will contest portion of the claim, which is testamentary capacity and undue influence, that there was a burden of proof mentioned there. Thank you.

While not a model of clarity, it does appear the burden of proof jury instruction claim was preserved as to counsel's request to inform the jury that Kenneth had the burden to prove the mental capacity claim and the undue influence claim by a preponderance of the evidence. We find counsel did not specifically request the preponderance burden be defined for the jury, and thus, that claim is not

preserved for our review. *See Schmitt v. Koehring Cranes, Inc.*, 798 N.W.2d 491, 499-500 (Iowa Ct. App. 2011) (concluding error was not preserved for appellate review on a claim the court erred in instructing the jury where the party failed to alert the district court to the issue at the time when corrective action can be taken, i.e. when the court provides the parties with the proposed and final jury instructions).

While the trial court did not indicate in the instructions on mental capacity and undue influence that Kenneth bore the burden to prove the claim by a preponderance of the evidence, we conclude such omission was harmless error. The jury instruction laying out both claims started by saying, "The law *presumes* a person has the mental ability to sign a change in beneficiary form and is free from undue influence when making the document." (Emphasis added.) The instruction was clear to say that Kenneth must overcome these presumptions in order to prove his claims.

The preponderance of the evidence burden is the lowest burden that can be applied. *State v. Beasley*, 50 N.W. 570, 571 (Iowa 1891) ("A preponderance of the evidence is the lowest degree of proof upon which issues of fact are determined."). This burden has been described to be evidence "that is more convincing that opposing evidence" and evidence "that is more likely true than not true." *Holilday v. Rain and Hail, LLC*, 690 N.W.2d 59, 64 (Iowa 2004). "[T]he quantity of evidence required of a party having the burden of proof in a civil law action is no more than will outweigh the evidence of the other side; that is, a preponderance of proof." *Hall v. Wright*, 156 N.W.2d 661, 667 (Iowa 1968).

Because it is the lowest burden of proof, proof that will just tip the scale in favor of one party over the other, and the instructions told the jury Kenneth bore the burden and the law presumes competency and a lack of undue influence, we conclude any inclusion of the terminology "preponderance of the evidence" in the instructions would not have affected the outcome of the trial. *See State v. Holtz*, 548 N.W.2d 162, 164 (Iowa Ct. App. 1996) ("[A]ny error in jury instructions must be prejudicial to warrant reversal.").

**B. Excessiveness of Damages.** In addition to claiming that the jury committed misconduct or there was an irregularity with respect to the award of attorney fees, Susan, Glen, and Elsie also claim that the award of attorney fees and punitive damages was excessive. Without more evidence, they assert the most the jury should have awarded for attorney fee is $1000 and the most that should have been awarded in punitive damages is $500 per defendant.

The district court did not conclude either award was excessive, stating: "Neither the amounts of the actual damages of about $46,200 or the punitive damages of $20,500[9] awarded were 'excessive' as a matter of law. In fact, they were quite moderate by current standards."

With the exception of removing that attorney fee award from the actual damages due to the lack of evidence, we find no abuse of discretion in the district court's rejection of this claim for a new trial.

**C. Verdict Fails to Do Justice.** Finally, Susan, Glen, and Elsie claim that overall justice was not done in this case and a new trial should be granted on the grounds previously mentioned. They claim they did not receive a fair and

---

[9] The actual amount of punitive damages awarded is 25,000 (12,500+5000+7500).

impartial trial. They failed to articulate how the trial was not fair and impartial, and we thus consider this claim waived. Iowa R. App. P. 6.903(2)(g)(3) (noting that the argument section is to contain the appellant's contentions and reasons with citations to the authorizes and references to the record and stating, "Failure to cite authority in support of an issue may be deemed waiver of that issue").

**IV. Judgment Entry.**

The final claim raised by Susan, Glen, and Elsie relates to the jury's verdict and the subsequent judgment entry by the court. They assert Kenneth was awarded duplicate damages under the two counts submitted to the jury. They claim the court erred in not entering a judgment against all five of the 2010 Ameriprise beneficiaries—Susan, Glen, Kristi, Terri, and Kelly—on count one, which asked for the 2010 beneficiary designation to be set aside, and thereby enter a pro-rata share of Kenneth's lost portion of the account against each of them: $4541.33 each. Once this is done, they claim there is then no need to enter judgment on the loss of expectancy of the account as to the intentional interference claim, count two. On count two, the jury awarded Kenneth the full amount of his one-sixth share—$22,706.55—against just Susan, Glen, and Elsie. Elsie was not a beneficiary of the account either in 2005 or in 2010. They also claim that the attorney fees and costs—$23,497.31—should have been divided between Susan, Glen, and Elsie as there was no evidence they acted in common or in concert such as would justify joint and several liability.[10]

---

[10] As previously stated, we have stricken the attorney fee award from the judgment entry due to the lack of evidence to support such an award in this case.

Kenneth counters by asserting while the jury found in his favor on both counts, the court only entered judgment on count two, eliminating any concern of duplicative damages. In the judgment entry the court ordered: "Judgment is rendered on the verdict in favor of the plaintiff, Kenneth M. Bronner, and against the defendants, Susan Randall, Glen Benson, and Elsie Pint, for: Actual Damages of $46,203.96, plus interest from the date the petition was filed." The court then went on to enter judgment individually against Susan, Glen, and Elsie for the punitive damages the jury awarded. Despite the jury findings that the 2010 beneficiary designation was invalid due to the lack of mental capacity of Edith and due to undue influence, no mention was made of whether or not the 2010 beneficiary designation was set aside.

In addition, Kenneth claims the relief requested by Susan, Glen, and Elsie is improper because he never sought money damages from Kelly, Kristi, or Terri—the other 2010 beneficiaries. To enter judgment as proposed by Susan, Glen, and Elsie, according to Kenneth, would absolve Elsie from any responsibility for the expectancy damages. Kenneth also points out that when the jury verdict was returned both parties were asked if there were any concerns or inconsistencies in the verdict, and both attorneys responded in the negative. He thus maintains that Susan, Glen, and Elsie have waived the claim now made on appeal.

Susan, Glen, and Elsie did file a posttrial motion regarding this issue, and the supreme court granted a limited remand so that the district court could address the claims made. The court on remand denied their request, concluding:

3.  When the sealed verdict was returned to the court by the jury on November 18, 2014, the trial court held a reported hearing with counsel for both parties, who were furnished copies of the verdict with interrogatory answers.  The court asked each attorney to review the verdict and inform the court whether or not either attorney found any inconsistencies in the verdict which could require further instruction and deliberation before the court could accept the verdict and discharge the jury.  Both counsel informed the court that there were no inconsistences.

4.  The jury verdict, including all answers to questions and damage awards, are not inconsistent with each other or contrary to the Jury Instructions. . . .

5.  As to the actual damage claims, the defendants [Susan, Glen, and Elsie], were joint tort-feasors, and the judgment should not be apportioned among them. . . . .

6.  There is no basis for allocating any portion of the judgment to the defendants [Kelly, Terri, or Kristi], because the plaintiffs pleadings did not allege liability on their part, the instructions did not include any claims against them, and the defendants [Susan, Glen, and Elsie] did not assert any cross-claim for damages, contribution, or indemnity from them.

The court provided the jury instructions and the verdict form to both counsel to review and make objections prior to submission to the jury.  No one voiced any concern about the possibility of a duplicative or inconsistent judgment:

> Mr. McPHAIL: The verdict form, the plaintiffs would agree with—we don't have any exceptions to that.  That's all I have.
>
> THE COURT: Ms. O'Donohoe, have the defendants timely received the court's instructions and verdict form?
>
> MS. O'DONOHOE: Yes, Your Honor.
>
> THE COURT: Have you had enough time to review it?
>
> MS. O'DONOHOE: I have.
>
> THE COURT: What are the exceptions and objections the defendants have?
>
> MS. O'DONOHOE: . . . And I guess with respect to the verdict form, I don't see a verdict form on the counterclaim.  I think that was left off.
>
> THE COURT: You're right.  I think I forgot that.
>
> MS. O'DONOHOE: That would be all the objections that I would have.
>
> THE COURT: Well, that's a significant objection on the counterclaim.  I guess we added that later because I didn't have any requested instructions on that or requested verdict forms from

defendant. I neglected to prepare one. So I think I need to do that. We will take a break.

. . . .

THE COURT: The court has made some changes in its instructions, based on comments from counsel. The court wants to make sure both sides understand what's been changed. . . . [A]nd the verdict form has been revised. . . .

Mr. McPhail, have you received copies of those new instructions? New questions for the verdict form?

Mr. McPHAIL: I have, Your Honor.

THE COURT: Have you, Ms. Donohoe?

MS. O'DONOHOE: I have.

THE COURT: What additional exceptions and objections, if any, does the plaintiff have to the instructions and verdict form?

Mr. McPHAIL: I have no more exceptions to the jury instructions. My objection to the verdict form is since we do not believe there is substantial evidence for the malicious prosecution claim to submit to the jury, we would object to the verdict questions that relate to the malicious prosecution claim.

THE COURT: What additional exceptions and objections, if any, does the—do the defendants have?

MS. O'DONOHOE: None, other than reserving all previous objections.

THE COURT: The court will overrule the objections and exceptions and give the instructions in the form as modified and just stated a moment ago by the court on the record.

Through a conference call between the court and counsel after the jury returned the verdict, both parties were given an opportunity to review the verdict and voice any concerns. Neither party voiced any concerns about the verdict being inconsistent or stated any reason why the court could not accept the verdict and discharge the jury.

THE COURT: Mr. McPhail, on behalf of plaintiff, are you aware or have you detected or determined inconsistencies within that verdict form?

MR. McPHAIL: No, Your Honor.

THE COURT: Are you aware of any reason then why the jury should not be discharged and this verdict accepted?

MR. McPHAIL: No, Your Honor.

THE COURT: Ms. O'Donohoe, are you aware of any inconsistencies within the jury verdict?

MS. O'DONOHOE: No, I'm not, Your Honor.

THE COURT: And are you aware of any reason why the court cannot accept the jury verdict and discharge this jury?

MS. O'DONOHOE: No.

The verdict form as submitted to the jury clearly permitted duplicative damages. The jury's finding that the 2010 beneficiary designation was executed by Edith when she did not have the mental capacity and the finding that she was unduly influenced to make the change invalidated the 2010 designation and set it aside. This then reinstated the 2005 beneficiary designation where Kenneth, along with Susan, Glen, Kristi, Rusty, and Kelly each receive one-sixth of the Ameriprise Financial account—$22,706.55. Pursuant to the jury's verdict on count one, Kenneth receives his share of the account. However, the jury also awarded Kenneth on count two (as directed by the court) $22,706.55 for "loss of expectancy from Ameriprise account" and this was assessed against only Susan, Glen, and Elsie as they were the only individuals who were identified by the jury as having improperly interfered. We conclude it was improper under the jury verdict for Kenneth to received his one-sixth share of the account as a result of the 2010 designation being found invalid plus an additional $22,706.55 from Susan, Glen, and Elsie for the same one-sixth share.

In light of the duplicative damages, we conclude the proper remedy is to vacate the prior judgment entry and remand for the district court to enter judgment on count one, which sets aside the 2010 beneficiary designation, reinstating the 2005 beneficiary designation. The judgment entry on count two should consist of only the award of punitive damages against Susan, Glen, and Elsie as we have already stricken the award of attorney fees awarded under this count.

**V. Conclusion.**

We conclude sufficient evidence was admitted for the jury to conclude Edith lack mental capacity in July of 2010 when she executed the beneficiary change and there was evidence the change was procured through undue influence.  However, there is a complete lack of evidence to support an award of attorney fees in favor of Kenneth and the jury's verdict in this case resulted in duplicative damages.  We therefore vacate the court's judgment entry, and remand the case for entry of judgment on count one, setting aside the 2010 beneficiary designation and reinstating the prior beneficiary designation executed by Edith in 2005.  The award of attorney fees on count two is stricken for lack of proof, and the award of "expectancy" damages is stricken because it duplicates the award from count one.  However, the award of punitive damages on count two is affirmed.

Costs on appeal are assessed one-half to each party.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.**